UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ELVIS FORTES | CR No. 08-0035 S |

MEMORANDUM AND ORDER

WILLIAM E. SMITH, United States District Judge.

Defendant Elvis Fortes ("Fortes") moves to suppress post-arrest statements made to detectives at police headquarters. Fortes claims that admission of the statements would violate his Fifth Amendment right against self-incrimination because the statements were a product of an improper custodial interrogation, and because detectives failed to obtain a valid waiver of his Miranda rights. After careful consideration of the testimony presented at an August 21, 2008 evidentiary hearing, and a recognition that this case represents a somewhat close call, the Court finds that the statement was not made in response to interrogation. Accordingly, there was no Miranda violation, and the motion to suppress is DENIED.

## I. FACTUAL BACKGROUND

On February 12, 2008, officers and detectives from the Pawtucket Police went to 10 Whipple Street in Pawtucket to execute a second floor apartment search warrant for narcotics. Uniform

patrol officers and Detective John Joseph ("Det. Joseph") observed Fortes outside walking a pit bull dog on Whipple Street. Officers Duhamel and Altongy approached Fortes, while Det. Joseph remained nearby in a surveillance vehicle. After an exchange between the officers and Fortes during which the pit bull dog bit Officer Duhamel, Fortes was placed under arrest and handcuffed.[1] Once Fortes was in custody in the back of a patrol car, Det. Joseph advised him of the search warrant and read him his Miranda rights from a standard rights form he carried. Gov. Ex. 1.

Fortes was brought to the Pawtucket Police Station while officers completed a search of the second floor apartment, seizing approximately 125 grams of cocaine and other alleged drug trafficking items. Inside the apartment, officers located Emanuel Oliveira, whom, Fortes claimed, was his cousin.[2] Monica Mendes, believed to be Fortes's girlfriend who lived there with him, also arrived. Both were questioned and taken into police custody.

Det. Joseph, accompanied by Det. Sgt. Slattery, next encountered Fortes several hours later in the holding area at the

---

[1] There is some dispute regarding threatening statements Fortes allegedly made about the dog and whether he intentionally released the dog on the officer. At the suppression hearing, the Court heard for purposes of background testimony about these events, which are themselves subjects of another defense motion in limine. The Court does not make any findings here as to Fortes's conduct with the dog.

[2] It is unclear whether Oliveira is an actual relative of Fortes or a friend.

station, where Fortes sat, without handcuffs, in a cell. Det. Joseph testified that he and Det. Slattery spoke with Fortes through the cell bars and asked Fortes whether he wanted to give a statement, help himself, talk to the police, or words to that effect. Fortes said no. Det. Joseph then said that Fortes's cousin and girlfriend were "also going to be charged with the same thing he was going to be charged with." Fortes immediately stated, "the other two had nothing to do with nothing, and you guys did your job, and I'm all set." The detectives said nothing further and left the cell block area. It is this statement that Fortes seeks to suppress.

II. DISCUSSION

Although Fortes first denies that he received Miranda[3] warnings, the Court credits the uncontroverted testimony of Det. Joseph, a 12-year veteran of the Pawtucket Police Department, that he read Fortes his Miranda rights from a standard form he carried with him in his vest. Det. Joseph Mirandized Fortes while he sat in the back of the patrol car outside of 10 Whipple Street, after officers placed him under arrest for the pit bull assault.

Fortes next challenges the failure of law enforcement to "re-Mirandize" him at some point after the initial arrest. The defendant did not focus on this argument in his motion and it appears to be more of an afterthought that occurred to the

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

defendant at the suppression hearing. In any event, the timing here is not significant for two reasons. First, the Court's examination of the jailhouse exchange between Fortes and Det. Joseph remains the same whether Fortes was Mirandized once, twice, at the residence, at the police station, or both. The issue is whether the post-invocation of rights comment by Det. Joseph regarding the cousin and girlfriend being charged was the functional equivalent of interrogation.

Second, any issue with respect to the time gap between the Miranda warning and the exchange is irrelevant because the record leaves no doubt that Fortes fully understood his rights, regardless of when they were administered.[4] This is clear because Fortes asserted his rights by saying he did not wish to speak to the detectives and refused to provide a formal statement. Further, Fortes's background reveals that he had repeated experience with the criminal justice system and prior arrests. See United States v. Palmer, 203 F.3d 55, 61 (1st Cir. 2000) (upholding consideration of prior arrest record as relevant to determining understanding and knowledge of rights). There is no evidence of any language barrier, mental or physical condition, or other inability to communicate. Moreover, the carefully worded nature of Fortes's

---

[4] Det. Joseph testified that the arrest outside of 10 Whipple St. likely occurred between 5 p.m. and 6 p.m., and that he spoke to Fortes in the cell block area sometime before he entered his report that evening at 10:26 p.m.

statements is indicative of his understanding of his rights ("I'm all set"), and supports no other inference. While a delay between the time a suspect is Mirandized and later questioned may, in some instances, be relevant, here it was not prejudicial and did not affect Fortes's comprehension.[5]

It is clear that Fortes, once in custody, had the right to refuse to speak with the detectives and, at that point, interrogation would have to cease. Miranda v. Arizona, 384 U.S. 436, 474 (1966). There is no dispute that Fortes was in custody, or that he said he did not wish to speak to detectives. To require suppression under Miranda, Fortes's statements about the "other two" following Det. Joseph's comment must have been the product of custodial interrogation. Id. at 444 ("[T]he prosecution may not use statements . . . stemming from custodial interrogation . . . unless it demonstrates the use of procedural safeguards effective

[5] A question arose at the suppression hearing regarding whether Fortes knew he faced drug charges when he spoke to the detectives, because the initial arrest involved the pit bull. Because the instant decision does not rely on Fortes's implied waiver, the relevance of this inquiry is debatable. In any event, a suspect does not have to know every topic that police may cover in the context of an interrogation. See Colorado v. Spring, 479 U.S. 564, 577 (1987) ("[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege."). And, to close the door on this point completely, Det. Joseph testified that he believed Fortes was informed of the drug possession charges at the station once the search was complete, and that Det. Joseph had identified himself to Fortes at the scene as part of the Narcotics Unit, there to execute a search warrant for drugs. This leaves little doubt that Fortes was aware of the drug charges.

to secure the privilege against self-incrimination."). These safeguards extend beyond traditional direct questioning to a suspect, and apply to its functional equivalent: "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). As long as a statement or question following a suspect's invocation of rights is not the functional equivalent of interrogation, the law will consider the suspect's decision to remain silent "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 103-104 (1975) (quoting Miranda, 384 U.S. at 479).

In Innis, three police officers drove in a vehicle with a suspect who had been arrested. 446 U.S. at 294. Two of the officers together expressed concern about a missing weapon and the possibility that a child would find the weapon and be injured. Id. at 294-95. The suspect then spoke to the officers about the location of the weapon. Id. at 295. In holding that the officers did not engage in the functional equivalent of interrogation, the Supreme Court reasoned that the statements were not reasonably likely to elicit an incriminating response, and that officers should not have known that the suspect would "suddenly be moved" to make an admission following what the Court described as a few "off hand remarks." Id. at 303.

Trial courts frequently wrestle with the question of whether statements by law enforcement officers are the "functional equivalent" of interrogation under Innis. Numerous cases have held that describing evidence and potential charges to a suspect is not interrogation. See, e.g., United States v. Conley, 156 F.3d 78, 83 (1st Cir. 1998) (officer's listing of and observations about evidence to suspect not interrogation). While not a perfect fit, the circumstances here are quite similar. A review of the case law yields a further set of non-exhaustive factors that may be used to guide examination of whether Det. Joseph's statement to Fortes following his invocation of the right to remain silent was reasonably likely or designed to elicit an incriminating response: first, was the statement made in a "brief and informal . . . food for thought" context? Plazinich v. Lynaugh, 843 F.2d 836, 840 (5th Cir. 1988) (informing suspect that his accomplice attempted suicide in the jail not interrogation); second, was the statement a "passing remark" and did the officer leave the area immediately after making it? United States v. Lopez, 380 F.3d 538, 546 (1st Cir. 2004) (telling suspect that officers found "the stuff" and that "the deal was off" not interrogation); third, was the statement worded in a non-confrontational manner and intended "simply to get the defendant's attention"? United States v. Genao, 281 F.3d 305, 311 (1st Cir. 2002) (no interrogation where officer showed suspect seized evidence, said "[w]e've got a problem here,"

and suspect admitted "[e]verything's mine. I don't want my wife to get in trouble"); fourth, did the officer have knowledge concerning any "unusual susceptibility" of a suspect to a particular form of persuasion? Innis, 446 U.S. at 302 n8. Did the officer carry on a "lengthy harangue" in front of the suspect, id. at 303, or use "particularly evocative" comments? Id. Finally, did the officer make a statement or ask a question, and was it directed to the suspect or overheard?

In this case, the scale tips in the government's favor on most of these questions. Det. Joseph testified that he and Det. Slattery did not have weapons with them in the cell block area. They did not bring Fortes to an interrogation room. And, there was no indication of intimidation or deception. Det. Joseph provided information in a statement, and did not ask an express question, although his comment was directed to Fortes and not simply overheard. The detectives were in the cell block area for only a few moments, just "long enough just to say that banter back and forth." They left the area immediately after the exchange. Nothing suggests Fortes was especially vulnerable or upset. There is no indication that the detectives knew anything about Fortes or the details of his family relationships such that this comment was "particularly evocative." Innis, 446 U.S. at 303. The statement was brief and vague, lacking potentially more provocative details such as possible penalties for the cousin or girlfriend if Fortes

did not confess. It is not enough that the statement may have struck a "responsive chord" with Fortes. Id.

None of the factors noted above is dispositive. In totality, however, the circumstances here indicate a low pressure environment, albeit one that may have had some "subtle compulsion." Id. On these facts, however, the Court cannot say that Det. Joseph should have known that his comment was reasonably likely to elicit an incriminating response.[6] It is not enough that the statement may have had the possibility of getting an incriminating response in return from Fortes. United States v. Vazquez, 857 F.2d 857, 863 (1st Cir. 1988). Moreover, while the defendant urges this Court to adopt the "why else would the detective say this, but to elicit a response?" standard, that common sense inquiry is oversimplified and not the law. If discussing the evidence against a suspect, the reasons he should cooperate, and the possible sentence to follow a conviction do not rise to the level of an interrogation, there can

[6] Det. Joseph testified that he commonly asks drug suspects if they want to "help themselves" because based on his experience they often "wish to get themselves out of a jam and help themselves out by cooperating." This lends additional support to the Court's finding that in this context, Det. Joseph's statement is more reasonably interpreted as "food for thought" as opposed to a "premeditated or deliberate design" to elicit an incriminating response. United States v. Taylor, 985 F.2d 3, 7-8 (1st Cir. 1993) (examining intent of officer as relevant to court's objective assessment of "functional equivalence"). The Court rejects the government's argument that Det. Joseph's failure to include the exchange with Fortes in his initial written report is evidence of some lack of intent to elicit an incriminating response, and draws no inference either way from that omission.

be little doubt that "we are charging your girlfriend and cousin too" similarly falls short. United States v. Sanchez, 535 F. Supp. 2d 216, 227 (D. Mass. 2008) (citing United States v. Tutino, 883 F.2d 1125, 1138 (2d Cir. 1989)); see also Arizona v. Mauro, 481 U.S. 520, 529 (1987) ("[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself").

Besides the nature of Det. Joseph's statement, the main reason these facts present such a close call is the precise timing of the exchange as recounted by Det. Joseph.[7] Both parties indicated in their briefs that Det. Joseph asked Fortes if he wanted to talk or help himself (or words to that effect), and Fortes responded with "no" and then, immediately thereafter, "the other two had nothing to do with nothing . . . you guys did your job, your good, I'm all set." Neither party mentioned Det. Joseph's statement about the cousin and girlfriend. At argument, the government submitted that Fortes's statements were "all part and parcel" of his assertion of the right to remain silent, and that his invocation was, in fact, an implied waiver that was complete when the entire exchange concluded.

The Court disagrees with the government that "no" did not mean "no" until Fortes finished with, "I'm all set." The testimony of

[7] It is unfortunate that the Court did not have the benefit of Det. Sgt. Slattery's testimony at the suppression hearing to shed additional light on these events.

Det. Joseph reveals a slight but important difference in the chronology of events:

> MR. FITZGERALD: Now, you said that you went down and you asked to speak to him, and he said no, and then you told him that his cousin and his girlfriend were also going to be charged?
>
> DET. JOSEPH: Correct.
>
> Q: And after he said no, you told him that his cousin and his girlfriend were going to be charged, right?
>
> A: Correct.

This is a crucial difference. Had the interaction been as both parties portrayed in their briefs, with no intervening statement by Det. Joseph, the Court would have most likely analyzed this issue under the familiar line of implied waiver cases. See Bui v. DiPaolo, 170 F.3d 232, 240 (1st Cir. 1999) (examples of implied waiver include spontaneously recommencing dialogue after invoking rights or continuing a "back-and-forth" conversation); see also Edwards v. Arizona, 451 U.S. 477, 485 (1981) (if suspect initiates dialogue absent interrogation, constitution permits police to listen). Absent the detective's statement about the cousin and girlfriend, Fortes's "they had nothing to do with nothing" comment has the marks of a voluntary, independent offering of information - an implied waiver.

Such is not the case here. Whether deemed an interrogation or not, it was Det. Joseph (not Fortes) who recommenced the dialogue. Det. Joseph's statement is what shifts the analysis in this case

from the Bui implied waiver line of cases to the more appropriate Innis line. Because the Court concludes that Fortes was not the subject of "custodial interrogation," it is not necessary to discuss whether he waived his right to remain silent. Innis, 446 U.S. at 298 n.2; Edwards, 451 U.S. at 486.

It cannot be the case that law enforcement officers have no flexibility in making declaratory statements or providing information to a suspect in custody so the suspect can make some meaningful choice about whether he or she wishes to talk or cooperate with investigators. See Caputo v. Nelson, 455 F.3d 45, 50 (1st Cir. 2006) (citing United States v. Payne, 954 F.2d 199, 202 (4th Cir. 1992) (providing information to suspect may contribute to the "intelligent exercise of his judgment regarding what course of conduct to follow")); see also United States v. Washington, 462 F.3d 1124, 1134 (9th Cir. 2006) (invocation of rights "does not preclude officers from informing the defendant about evidence against him or about other information that may help him make decisions about how to proceed with his case"). Some line must be drawn to divide appropriate informational "food for thought" remarks from disguised interrogation designed to induce inculpatory statements. Where that exact line may lie will vary case to case, but here it was not crossed.

The final arrow in Fortes's quiver is that admitting his statements would be so unduly prejudicial (as compared to their

probative value) as to violate Rule 403, and "too confusing." This argument misses the mark, however, because the statements have more than the merely marginal relevance the defendant suggests. And, at trial the defendant undoubtedly will argue that he did not actually admit to any wrongdoing in his remarks, but simply explained that his cousin and girlfriend were not involved. It is not unfairly prejudicial to allow the jury to sort all of this out, and choose between the possible inferences.

III. CONCLUSION

The statement was not the product of custodial interrogation. Thus, the law deems it free and voluntary, and Fortes's Fifth Amendment right against compelled self-incrimination was not violated. See Miranda, 384 U.S. at 478; Innis, 446 U.S. at 299. For these reasons, the motion to suppress is DENIED.

IT IS SO ORDERED.

WESmith

William E. Smith
United States District Judge
Date: 9/12/08